[No. 2679.]

CLAY DRYE *v*. THE STATE.

MURDER.—INDICTMENT for murder, in addition to other allegations, must set out the means by which life was extinguished: i. e., if by a weapon, its character must be stated, or that it was unknown to the grand jury; if by other means, such means must be alleged. See the opinion on the question, and also for an indictment held insufficient to charge the offense of murder.

APPEAL from the District Court of Maverick. Tried below before the Hon. T. M. Paschal.

The purpose of the indictment in this case was to charge the appellant with the murder of C. H. Lund, in Maverick county, Texas, on the fourth day of December, 1882. His trial resulted in his conviction of murder in the second degree, with a term of five years in the penitentiary assessed against him as punishment. The facts in this case are summarized as presenting an interesting phase of conflicting testimony.

J. G. Shannonhouse was the first important witness presented by the State. He testified that on the fourth day of December, 1882, he was a peace officer, serving in the capacity of deputy sheriff of Maverick county. He knew C. H. Lund, who was killed by the defendant in the Arlington saloon, Eagle Pass, Maverick county, Texas, between the hours of one and two

o'clock a. m., on the fourth day of December, 1882, and witness was present when the killing occurred. The witness stepped into that saloon on that morning, and he and the defendant took lunch together at the lunch stand near the bar. When they finished and left the lunch stand, the defendant took with him some bits of chicken, and was still eating when they stepped into the gambling department. The deceased was then sitting behind a monte table, quietly talking to some parties, and as the witness and defendant approached them, defendant threw some chicken bones and struck the deceased on the cheek. Thereupon the deceased straightened up and asked: "What do you mean, Clay?" The defendant did not reply, but continued to advance, and when he reached the corner, where the deceased was by this time standing, a scuffle between them ensued. The deceased made no advance whatever, but in the scuffle appeared to stumble somewhat over a chair, which he then caught up, as if to strike with it. The defendant at the same time caught up a chair, and the witness interfered, separating the parties, whom, up to this time, he thought to be in play. Witness at this time noticed blood on the shirt and face of the deceased.

The deceased at this time left that part of the saloon building, but returned in three or four minutes and said to defendant: "You have insulted me; I am not able to fight you a fist fight, but I will shoot it out with you in the street." To this proposition the defendant replied: "All right;" and the two parties, defendant and deceased, agreed to cross the river into Mexico and shoot it out, and shook hands over the agreement. The deceased then left the room, and during his absence the witness asked the defendant: "Clay, what does this mean? What is this row about?" He answered: "He has treated me very meanly. He called me a d—d rascal the other night, and no man can do that and get away with it."

The deceased was gone some five or ten minutes, when he stepped into the door of the saloon and asked: "Where is Clay?" The defendant answered: "Here I am." The defendant and the deceased then engaged in a talk, all of which the witness did not hear. The deceased soon walked into the front room, and in a short time the defendant followed. The deceased said that they (he and defendant) could go out into the street and shoot it out, or cross the river next morning for that purpose. The witness told them they could do nothing of the kind,

and that if they did not keep quiet he would lock them both up. Witness first made this remark to the defendant, who remarked: "I am quiet." The deceased, in reply to this admonition of the witness, said something that the witness did not understand, but it was substantially the same as the defendant's reply.

The deceased then walked out to the saloon door facing west, and leaned against the door, his face looking east. His hands were raised up, and apparently rested on his waist or hips. He had no pistol that the witness saw. The defendant walked into the saloon from the gambling department, passed behind the bar for a minute, and then from behind the bar down the saloon towards the deceased, and passed the deceased and stepped out into the street, and almost instantly wheeled with a pistol in his hand, and stepped back into the door. The deceased jumped back and said: "Give me a show." The witness sprang between them and grabbed the muzzle of defendant's pistol. The defendant jerked the pistol out of witness's hand, and with a whirl threw it over the witness's shoulder and fired. Witness turned immediately and saw the deceased fall. He had no pistol in his hand as he fell that the witness saw. He had none on his person that the witness saw, nor did the witness see a pistol on the floor. The witness saw no effort on the part of the deceased to shoot or injure the defendant when the latter passed him going out of the door. The witness arrested and disarmed the defendant, and called deputy sheriff Ben. Oglesby to assist in carrying him to jail. After going about one hundred and fifty yards in that direction, witness sent Oglesby back to stay with the body.

The deceased weighed between one hundred and forty-five and one hundred and sixty pounds; he was tall and slender, and twenty-one or twenty-two years old. The defendant would weigh one hundred and ninety or two hundred pounds, and is apparently a very strong, heavily built man. After catching hold of the defendant at the time of the shooting, the witness did not see more of the deceased until he saw him dead on the floor. But one shot was fired, and that the fatal one fired by the defendant. Witness saw no pistol on the floor, but was handed one by Ben. Oglesby, which, the witness was informed, was picked up from the floor near the body of the deceased; which pistol was still in the possession of the witness.

On cross-examination the witness said that after he jumped

between the deceased and the defendant and caught the pistol of the defendant, he could see nothing of the deceased until after the shooting, as his back was, during that time, turned towards the deceased.

J. D. McCome, who testified, for the State, that he stepped into the saloon door about the time the shooting occurred, gave about the same account of the occurrences at that particular time as was given by the witness Shannonhouse. He stood within six feet of the deceased at the time he was shot, and saw no pistol in his hand, nor did he see a pistol on the floor. It was possible, however, for the deceased to have had one at the time and the witness not have seen it.

C. C. Akers testified, for the State, that he kept a saloon and livery stable in Eagle Pass, Texas. The deceased was in the habit of coming to his saloon and getting a pistol whenever he went home from town. On the morning of the shooting he, the deceased, came to witness's saloon, walked behind the bar, and asked the witness if there was a pistol there. He took up and examined one, when the witness, observing blood on his face and shirt, and that he was excited, told him not to take the pistol, and asked him what was the cause of his excitement. He replied that the defendant had struck him over the head with something at the Arlington saloon, and that they, he and defendant, had been engaged in a difficulty. Witness then insisted that the deceased should not return to the Arlington, as he would become involved in a difficulty. He replied: "No, we are not going to have a difficulty to-night, but we are going across the river to-morrow at nine o'clock and shoot it out."

After a short time the witness went to the Arlington, and, as he stepped in, he heard some parties talking. It was suggested by some one that the matter ought to be settled; that there was no occasion for a difficulty. Witness heard the deceased say: "Come, let's go and settle it; I am ready,"—or, perhaps, "Are you ready?" Witness saw the defendant walk behind the bar, and saw the deceased walk to the door facing west, and take a position facing east. The defendant walked from behind the bar, down the room towards the deceased, passed the deceased within a few feet, and went out into the street. Almost instantly the defendant faced the door with a pistol in his hand, whereupon the witness "broke to run" into the dance hall adjoining. As he started he saw some one grab the defendant, whom he took to be Shannonhouse. As he got to the dance hall

door he heard one shot, and, returning, found the deceased on the floor, dead, shot through the face. Witness could not see the deceased after he, witness, started to run and before he reached the door, but when he, deceased, was leaning up against the door, he had no pistol in his hand. His hands were then both in plain view. Deceased made no effort to shoot the defendant when the latter walked from the bar past him, and out into the street.

Cross-examined, the witness said that the deceased could have had a pistol in his hand at the time the shot was fired and the witness not have seen it. When the deceased asked for a pistol at the witness's saloon, he was considerably excited. "He put the pistol down in his pants by his side or in front."

L. C. Mosier, the keeper of the lunch stand in the Arlington saloon, was the first witness for the defense. His statement was confined to the occurrences in the barroom immediately preceding the shooting, and does not vary materially from that of the witnesses for the prosecution. He testified, however, that as the defendant was walking towards the deceased when the latter was standing in the doorway, he, witness, saw the deceased pull something white out of his pocket, which at the time the witness took to be a handkerchief.

On his cross-examination, the witness stated that as the defendant passed the deceased and went out at the door the deceased had one hand on his breast and the other on his hip. He made no demonstration towards the defendant at that time, though he could, if armed and inclined, have shot the defendant. Witness did not see the deceased have a pistol at any time, nor did he see a pistol on the floor.

Charles Wild, the second witness for the defense, testified that he was with the deceased in the gambling room when the defendant first came in and threw the chicken bone at deceased. His narrative of the occurrences in that room, though not so full, was consistent with that of other witnesses. He had charge of the money and paid more attention to that than to the preliminary difficulty. He stated that on the return of the deceased to the gambling room after the agreement to shoot the matter out on the morrow he, the deceased, asked the defendant: "Are you heeled?" to which the defendant replied that he was not. The deceased responded: "Then rustle." This witness related the subsequent proceedings, up to the time that the defendant turned into the door with pistol in hand, substantially as they

were related by the other witnesses. At this point he ran out of the house and did not see the shooting, though he heard the shot as he turned to run. He did not see the deceased with a pistol at any time, nor did he see a pistol on the floor. Deceased made no demonstration at defendant while the latter was walking towards the door, though he had ample time to have drawn a pistol.

Albert Solomon, night-watch or bartender at the Arlington saloon, was the next witness for the defense. Beyond the fact that he heard some words between the deceased and defendant, his narrative relates to the occurrences in the saloon room immediately preceding and at the time of the shooting. Deceased first came from the gambling room into the saloon and took a position at the west door. The defendant followed presently, and went behind the bar for a few moments. He then left the bar and walked towards the door at which the deceased was standing. As he, defendant, passed the deceased, the witness heard the deceased say something which he could not understand, and saw that he, deceased, at the same time drew a pistol, whereupon the defendant whirled and drew his pistol. Shannonhouse caught the defendant at this time, and the deceased squatted down behind Shannonhouse with his pistol in his hand as if trying to get a shot at the defendant. Defendant, who was then scuffling with Shannonhouse, threw his pistol over Shannonhouse's shoulder and fired, and the deceased fell dead. Witness looked, and saw a pistol, handkerchief and hat lying by the body. Ware dragged the body from the blood, and subsequently handed a pistol to Mr. Oglesby.

Henry Ware testified, for the defense, that some ten or fifteen minutes before the shooting, deceased came into his, Ware's, saloon and tried to borrow a pistol. The witness refused, and he left. When he heard the shot, the witness went to the Arlington and found the deceased on the floor, dead. He dragged the body from the pool of blood, and as he did so found a pistol which had evidently been dropped by the deceased. It was not cocked. Witness gave this pistol to an officer. There was a handkerchief also by the body.

The motion for new trial set up errors as follows:

In permitting witnesses, over objection, to testify as to the means employed in killing the deceased, the indictment failing to allege a weapon of any character.

In receiving, over objection, evidence as to the cause of the death of the deceased.

In the charge of the court.

In the verdict as unsupported by law or evidence.

Motion in arrest of judgment set up:

1. "The indictment is insufficient, not alleging the instrument, means nor manner used to take the life of the deceased."

2. "Because the indictment fails to allege in words the time of the commission of the alleged offense, but sets the time for it in figures."

Motions were overruled, and appeal prosecuted.

*Walton & Hill,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.  In this case the indictment, which purports to be for murder, charges that "one Clay Drye, on or about the 4th day of the month of December, in the year of our Lord one thousand eight hundred and eighty-two, in said county of Maverick and State of Texas, did with malice aforethought kill and murder C. H. Lund; contrary to the statute and against the peace and dignity of the State."

This indictment is fatally defective.  An indictment for murder "must set forth the means by which the life was extinguished; hence, if it was by a weapon, it must say what the weapon was, or allege it to be unknown to the grand jury.  If it describes the killing as done in a way requiring no weapon—for example, by the use of the hands—none other need be mentioned.  The particulars of the weapon—as that it was of such a length and breadth—need not be given; to say, for example, that it was 'a certain wooden stick' will suffice.  And if stones were used their number need not be stated.  A 'loaded pistol' will do." (2 Bish. Crim. Proc., 3 ed., sec. 514; *The State* v. *Williams,* 36 Texas, 352; *Dwyer* v. *The State,* 12 Texas Ct. App., 535; *Peterson* v. *The State,* 12 Texas Ct. App., 650.)

The indictment being fatally defective, the judgment is reversed and the prosecution dismissed.

*Reversed and dismissed.*

Opinion delivered May 9, 1883.